Now we'll move to the last case that we have on the argument calendar this morning. That is Gater Assets Ltd. v. AO Gazsnabtranzit. Let me just make sure council is here for the appellants. Good morning, your honors. Robert Cryer from Moldova Gas. All right. And public of Moldova. Okay, so just so it's clear, there's 12 minutes total that has been allotted for the two of you. And you've split it up so that seven minutes Mr. Cry out of the gate with three minutes rebuttal. And Mr. Baldwin, one minute and then one minute rebuttal, right? Yes, sir. Okay, great. And then for the appellee? Yes, your honor, Mike McGinley. You've got 12 minutes that we don't have to split up in any way, shape or form. So very good. Mr. Cry, we'll hear from you. Thank you, your honors. May it please the court. Moldova Gas is not an alter ego of the Republic. The Republic does not exercise significant and repeated control over the company's day to day operations. And there was no abuse of the because the district courts ruling on the second prong was totally irreconcilable with this court's precedence. The court made clear and em limited that the common thread in fraud or injustice cases is that the sovereign state has abused the corporate form. The fact that Moldovan courts may have made procedural errors in Moldovan recognition proceedings is not an abuse of corporate form. The claim that Moldova Gas prioritize creditors by paying some debts and not others is not an abuse of the corporate form. And the fact that Moldova Gas now owes $6 billion to gas prom because entities in Transnistria do not pay their gas bills is simply not an abuse of the corporate form. Gator argues that Moldova Gas would have been more profitable if the Republic's rate regulator had allowed it to charge more for gas. There's two problems with that argument. First, no court has ever held that a foreign sovereign's regulatory decisions about what its natural gas utility can charge amounts to an abuse of the corporate form. But beyond that, Gator's own evidence shows that at most 2% of Moldova Gas's losses stem from rate regulation decisions, while 90% of those losses stem from the fact that Transnistria simply doesn't pay its gas bills. So the facts don't support that argument, even if it had any legal merit. Turning back to the first prong now, the Republic does not exercise significant and repeated control over the company's day-to-day operations. The decision below is of the state, where a majority of the company's shares were owned and the majority of its board appointed by a different company in a completely different jurisdiction. Gator points out that the Republic nominates Moldova Gas's chairman, who has some broad management powers, that there are certain votes from which Gazprom is recused by conflict of interest rules, and that there are some votes subject to a supermajority requirement. None of that matters. Under this court's precedence, subsidiaries are presumed to be separate entities, even where the parent owns 100% of the shares, casts 100% of the votes, appoints 100% of the board, that exercises 100% of the company's management authority. Under EM Limited, Gator had to show that the Republic used its authority to appoint board to interfere with the company's day-to-day operations. There's simply no evidence of that at all. Gator points to the Republic's regulation of gas prices and technical servicing. Your honors, those are regulatory decisions. They are not the type of domination by a shareholder that amounts to alter ego status. Besides, Moldova Gas has sued its regulator more than 80 times. That history is hard to explain if its entire corporate existence is a sham. Gator points to one supply agreement from 20 years ago, where the Republic and Russia agreed on gas prices and certain related terms. Two responses to that. First, that supply agreement was not an interference in the company's day-to-day operations. It was a high-level trade agreement that explicitly left the details of implementation up to the companies. But second, that agreement expired 15 years ago, 10 years before the relevant date before determining jurisdiction in the renewal action. And every agreement since then has been agreed upon by the companies, not by their governments. Gator points out that one government official helped negotiate the 2006 agreement, but she expressly disavowed any decision-making authority. In her own words, the price was mutually agreed between Moldova Gas and Gazprom, under my auspices because I was a negotiator, but the decisions were not taken by me. That's at page 1202 of the appendix, and Gator has literally no response to it. Finally, Gator claims that the 2001 agreement were more recent, where the Republic was negotiating a supply contract. Would that be the sort of evidence that would show that they're not respecting the corporate form or there's no distinction? Does your argument depend on how recent it was? It does not. They're alternative arguments, Your Honor. We would contend that even the 2001 agreement, by which the government set price terms, is not alter-ego evidence because it doesn't address the day-to-day operations of the companies. It's a very high-level trade agreement that sets price, but that's no different from many other trade agreements where you have a cross-border transaction. But there's an alternative basis. Even if the court doesn't agree with that, it's just not timely because that agreement expired in 2006. It's a trade agreement, right? Isn't it a supply contract for Moldova Gas with Gazprom? It's certainly more specific than a typical trade agreement, and I will grant you that. Our point is simply that it's still a high-level transaction because it doesn't address day-to-day operations. It only sets the price, which is a term that applies during the entire five-year term of that contract. If the Republic were doing that all the time, we're just setting prices for supply contracts between Gazprom and Moldova Gas, you would say that still wouldn't show alter-ego status? That's our position, Your Honor, but our case does not depend on it because that agreement expired 10 years before the relevant date for jurisdiction, and every agreement since then was agreed by the parties. The only evidence they cite to the contrary was that a single government official was involved in those discussions as a negotiator, but she herself said she had no decision-making authority. If the government official that shows up for negotiations has no decision-making authority, there's simply no evidence of day-to-day control. In this court's arch trading case, in that case too, government officials were involved in negotiating contracts, and this court said that that's not sufficient to show alter-ego status. Gator's overall approach, Your Honors, is essentially to throw up a boatload of irrelevant facts and claim that the totality of the circumstances somehow supports alter-ego status, but combining a bunch of irrelevant facts does not somehow make them relevant. Zero plus zero plus zero is still zero at the end of the day. Veil piercing is supposed to be a rare exception, applicable only in exceptional circumstances, and this court's extremely reluctant to disregard corporate form. Gator does not meet that demanding standard, and this court should reverse, if I can reserve the rest of my time. All right. Yes, that's fine. We'll now hear from Mr. Baldwin for a minute. Thank you. Good morning, Your Honors. I wanted to briefly talk about venue in this case, and I know the court will look at the venue statute, which discusses that a substantial part of the events or omissions have to occur in this district. The district court found that the substantial parts of the event was the default judgment. That is the only basis on which the court found venue, was that the default judgment was the substantial part of the events. This court has referred to a Daniel B. American Board of Emergency Medicine. This court quoted Woodkey versus Don in Eighth Circuit opinion to state that referring to event and omissions giving rise to a claim, Congress meant to require courts to focus on relevant activities of the defendant and not the plaintiff. Therefore, it's the actual- But up here, they're making a claim for renewal of the 2000 judgment. Isn't that the relevant conduct, the relevant activity for the purposes of this claim? I mean, the court did state that this judgment was the events that occurred in this district. Right, and the New York CPLR allows you to come into court when you're trying to enforce a money judgment that was entered in a court in a different state, right? That's correct. I'm sorry. Yes, that is correct, but the court still has to have venue. The court has to meet the statutory requirements set out in 1391F here. That's obviously congressionally passed. That's a law. That's a statute. There has to be venue. That venue has to be met without regard to what the CPLR allows. The venue of this court has to, or the venue of the district court has to be satisfied, and in this case, it doesn't because there's not activities of the Republic of Moldova, which is who you have- But you're saying venue was inappropriate in the 2000 judgment, right? Does that automatically make it inappropriate in a renewal action? I don't know if it would automatically, Your Honor, but I'll say this. I do think it was improper. They could have brought it in D.C., should have. They didn't, but putting that aside, I don't know if it could always be improper, but in this case, the court held that the only event that occurred in the district and what she was relying on was the default judgment. That was not an event- But isn't that always going to be the case when the renewal application pertains to a default judgment? It seems to me that our concern here is that you're saying that a court does not have venue to basically act on its own judgment. Now, I understand that you're also challenging the venue on the original judgment, but you've defaulted on that, and now you're telling us that a court does not have venue to basically act with respect to its own judgment, and I think that's what seems troubling. Your Honor- Help us out. I will. First off, I'll just make the broader point that the statute is a requirement, and the statute sets out the rules. I don't believe that there's necessarily an issue with it, but to the extent there was, that's Congress. That's the drafters. That's the issue that relates to there, but more importantly, this is a statute that has to do with sovereigns, particularly, and the statute states that a court does not have venue to basically act on its own judgment, and I think that's what seems troubling. Your Honor, I don't believe that there's necessarily an issue with it, but to the extent there was, that's Congress. That's the issue that relates to there, but more importantly, this is a statute that has to do with sovereigns, particularly, and the statute states that a court is not the default, the actions that led up to the default judgment. What the event is, is the default judgment, because if you look at the CPLR, it's meant to be a plenary action, so in that sense, I think that the way it's being sort of characterized is that, well, this is just kind of a continuation of the earlier proceeding. It's not. It's a plenary action. The subject matter of that action is the original judgment that has to be renewed, but the default action— That suggests that you can default and give up effectively a venue challenge, but no problem because you can raise it forever. Whenever they try to renew that judgment, you can come in and challenge venue. Is that what you're saying, New York law permits? No, Your Honor. I'm saying— Basically, the venue challenge, like a jurisdiction challenge, can be heard at any time? I think that it can be heard in the renewal action when there has to be venue under the statute. If you look, the statute has to be satisfied. Put aside the CPLR because the CPLR can't force, can't override the 1391F provision. In the renewal action, can you reopen the original action and reconsider it? I'm not aware. I don't think that was necessarily done here, Your Honor, but— No, but can you? I mean, so you're saying it's possible to do a renewal action without reevaluating the original action, right? It's possible just by looking through the facts of the 2000 default judgment. That's how you can resolve the renewal action, right? Yes. All this other conduct that did not have connection with New York is not even something that the court's going to consider in a renewal action. I think that's correct, Your Honor, but also the judgment itself doesn't have anything to do with the defendant's conduct. The question is not conduct in general. The question relates to, if you look at the cases, they all talk about the activities. What activities? Those activities have to be, as this court has placed in dicta in the decision that I was referring to, the American Board of Emergency Medicine. Those activities have to be the activities of the defendants, not the activities of somebody else. Okay. Well, look, you had a minute. You're now going on seven. I mean, I think your argument, then, is that venue is always something you get to argue, even if you default in the first instance. All right. Let's hear from Mr. McGinley on that and the other points raised. Good morning, Your Honors. May it please the Court. Michael McGinley from Deckard LLP on behalf of Gator Assets Limited. The District Court correctly concluded that from its inception, Moldova gas has been both an alter ego and an organ of Moldova. The Republic created it by state decree for the twin national purposes of servicing a crushing sovereign debt to Gazprom and providing affordable natural gas to the country's citizens. Throughout its existence, Moldova has extensively controlled Moldova gas to achieve those purposes, while thwarting Gator and its predecessor in interest from collecting on a 22-year-old arbitral award stemming from reinsurance on yet another debt to Gazprom. Over the course of the past two decades, appellants have sought to evade paying that debt through a series of maneuvers that only further confirm the validity of the award and the fact that Moldova gas qualifies as both an alter ego and an organ of Moldova. Judge Preska's two thorough opinions and the extensive record amply demonstrate that there was jurisdiction for the 2000 judgment and the renewal action and that SDNY is a proper venue for the renewal action. Here on appeal, defendants attempt to attack those rulings largely by quibbling with certain facts in isolation and by emphasizing that Moldova is a minority shareholder in Moldova gas. But those arguments are insufficient to disturb Judge Preska's clear factual findings and they are inconsistent with the fundamental legal principles of alter ego analysis, that corporate formalities like share ownership do not control the analysis, but instead the actual facts on extensive control and fraud or injustice are what matter. All right, but the difference is usually that means maybe you only have 30% of the shares, but you control everybody else who's got shares and that informs the analysis. But here, the Moldovan interests collectively are less than a majority of the shares, right? That's right, Your Honor, but that still is not controlling. The first thing I think that needs to be emphasized is why was Moldova gas created? Moldova gas was created largely to service an already crushing amount of sovereign debt that Moldova owed to Gazprom through previous predecessors and interest. And when it created Moldova gas to service those interests, it naturally would give Gazprom a 50% interest because it's a major creditor. But in doing so, it ensured that... That doesn't show that it's an alter ego, right? Like the fact that Moldova is deciding to deal with this problem of debt by creating a corporate entity means that there's a separate corporate entity. So that would show that maybe it's an agency or instrumentality, but it doesn't get you to alter ego status, right? Well, I'm not sure that, Your Honor. And certainly, we don't say that that's the only evidence of alter ego status. I think when you look at Judge Preska's opinion, obviously there are quite a number of factual findings that all add up to it. On extensive control, we would point out that Moldova has the power to appoint the chairman of the executive board, which Judge Preska found, as a matter of day-to-day control over the company. And we would also point out the fact that... Isn't that subject to approval by the board and doesn't Gazprom control a large number of those seats? Didn't they reject a candidate at one point too? It is subject to approval by the board. And in the instance where defendants say that Gazprom rejected a candidate, ultimately the candidate chosen remained a highly entrenched state official from Moldova, Mr. Batnari, who is the head of the Directorate of Intelligence and Security. The other thing that I would point out, Your Honor, is that in the one instance that defendants point to where there was any kind of tension between the chairman and the government, that person was run out of the company and run out of the country on threat of criminal prosecution. So I think that's pretty clear evidence to me. But haven't we said in prior cases or in that prior case that if the way the country is exercising influence over a corporate entity is by appointing people, and it has to exercise influence through those people as opposed to directly, it still is a separate corporate entity, right? If I'm understanding your question correctly, Judge Manasci, that you're asking that does the country still have to exercise some form of influence over its appointments? They get to appoint people to the board, but the only way they exercise influence over the corporate entity is that they appoint board members who are going to be sympathetic to the country and so on. That's not extensive control by the country, right? Alone, that is not extensive control, but I think that's the importance of the factual point that the one person who deigned to stand up to the state was run out of the company and run out of the country on threat of criminal prosecution. I think that pretty clearly shows influence. I guess what I was thinking is maybe it shows that the way they're exercising control is through the individuals who are appointed to the leadership of Moldova Gas because they were not able to just tell him to do something else, or they weren't able to tell the entity what to do. They had to affect the behavior of a separate individual. I was wondering whether that might cut in favor of the idea that maybe it's an organ or instrumentality, but it's not an alter ego because they exercise influence through their appointees. Well, certainly we think that it's also an organ and instrumentality under that analysis, but I think it also proves alter ego. I think it's important, as I said, to recognize that it's a whole panoply of facts. It's a constellation of facts here that Judge Preska- I want to ask about another one. Judge Preska also said that the fact that the Republic engages in rate making and sets rates that Moldova Gas can charge also shows alter ego status, but isn't that just something that governments do all the time? Our government does rate making for lots of industries, and we don't say that that turns the companies into alter egos of the government. I think this is another example where the defendant's effort to sort of isolate facts and then claim that they don't alone add up to alter ego is somewhat deceptive here. What is going on with the rate setting is that Moldova has created this company for the avowed purpose of both servicing the sovereign debt, but providing affordable natural gas to its citizens, and then it's through the rate setting has forced the company to operate at a substantial loss for many years, and in many instances has exerted political control to make sure that rebates are paid in a certain fashion at a certain time. It's required Moldova Gas to service the natural gas pipeline that belongs to the country, including at the day-to-day level of mandating certain actions with respect to 1.5 kilometers of a certain piece of pipeline. So this isn't just run-of-the-mill Con Edison style regulation. This is heavy control because all along from the very beginning, this company has merely just been an agent of the Republic of Moldova, and I think it's important to emphasize too with respect to the debt that this is not just sort of debt that Moldova Gas has racked up over the course of history of its own company. There's an element of it that is that, but Moldova Gas was created as a repository of pre-existing debt, including the debt at issue in this case. And so the defendant's argument that there's no abuse of the corporate form with any nexus to this case is simply fanciful. The whole reason why we're here is because they've abused the corporate form by creating a new entity after an arbitral award was, after a debt was incurred and then an arbitral award was entered, and now they- You're saying you don't rely on the racking up of the debt after the fact, the way they say. You're saying that it was an abuse from the beginning because it was a repository of debt that was suspect for some reason? We say it's both, but I think under Bredis, you know, what the Fifth Circuit held in Bredis is that when a government incurs a debt, and in that case it also was an arbitral award, then creates a new entity that from the outset it undercapitalizes and then says to U.S. courts, oh sorry, you can't collect against- the plaintiff can't collect against anyone because their debt is to this predecessor entity that no longer exists, and now there's this new entity that exists, and you can't collect against them, and under corporate formalities, you can't come against the state. In that case, the Fifth Circuit had no problem saying that Turkmenistan had abused the corporate form, would be committing a fraud or injustice if it allowed- if the court were to allow them to take advantage of that. We'd say same is true here. So the reason that we are debating whether Moldova gas is an alter ego of Moldova is because we have this distinction between the ability to exercise personal jurisdiction over sovereigns as versus corporations or other entities, and so there's some debate over whether that's legitimate. Isn't that a very odd thing that, you know, foreign sovereigns who have a sovereign immunity and are entitled to all sorts of respect, it would be easier to exercise jurisdiction over them than over corporate entities? Why is that, you know, are we right about that in drawing that distinction? I think you are right, your honor, and obviously, you know, Frontera was not just a sort of blip along the way. It very consciously overruled Texas trading and did so in a very thorough and well-reasoned manner. I think, you know, as you know, the foreign states to be treated differently than U.S. states, and I think that that, you know, that has held true. I think, you know, doing it through alter ego also makes sense. There's a suggestion that somehow bank check has no role to play here. I don't think that makes sense because bank checks' whole purpose is to help courts decide when something that doesn't otherwise qualify as a foreign state does qualify as a foreign state. So I don't think there's any reason to reconsider Frontera or Pemex. The other point that I would make, your honor, is that, you know, we think there's grounds, even if you don't find alter ego, to still exercise subject or personal jurisdiction here under the question that was expressly left open in Frontera. And then the other point that I would make, your honor, is that... Meaning that if it's not an alter ego of the country, it's just a agency or instrumentality of the country, we should treat it like the country as opposed to like a private foreign corporation. Correct, and I think it's important here to remember that the basis on which Judge Prescott found instrumentality status was that it's an organ. And the reason I think that that's relevant is that, you know, it's one thing to say a company that's over 50% owned, you know, should be treated as the state, but the organ analysis requires, you know, the filler factors are five pretty intense factors that come somewhat close to the bank check analysis. So I don't think that it's that odd to say that an organ of a foreign state that has sovereign immunity under the FSIA also has to live with the trade-off, which is that there's sovereign immunity, but personal jurisdiction rises and falls with respect to the FSIA. And I point out too that it's not that under Frontera there's just no personal jurisdiction analysis. It's that the personal jurisdiction analysis is done through the course of the FSIA. Yes, but there's a provision in the FSIA that says if the FSIA's requirements are met that personal jurisdiction exists. I was going to ask you, counsel, where you would draw the line between the decisions that Judge Prescott made that are ones of fact that we might be reviewing more deferentially than her ultimate conclusions law. Where would you draw the line on that? So Judge, obviously that's somewhat a qualitative question and it's always a hard question to draw that line. What I would say is that when you look through her 120 pages of the decision, there are a number of places where she resolves disputes of fact. And I would say by and large, the arguments by the defendants on appeal are quibbles with those questions of fact. For example, that the executive board through the chairman extensively controls the day-to-day operations of the company. That's on SP 93. That's a finding of fact that when the president of Moldova said that Moldova gas's debts are Moldova's debts, that's a finding of fact. And obviously defendants want to say that somehow that was a misunderstanding of what he said, but that's a factual question that they argued to the lower court and Judge Prescott. It's a factual question that he said that, but then it's a legal question as to whether if a country says that kind of thing about a corporate entity that makes it an alter ego. We're not questioning whether he said the thing. We're asking whether that fact leads to alter ego status, right? Well, that's right. Whether the sum total of the facts taken together lead to alter ego status is the legal conclusion. Here you have fact findings that fall under every single bucket of extensive control and both prongs of the alter ego analysis as a whole. And what Judge Prescott emphasized as well is that alter ego analysis ultimately is an equitable decision. And so it's really important not to isolate these facts on their own, but to say taken as a whole, what's the picture here? And the picture here is that from its very beginning, the whole purpose of MoldovaGaz was to serve as a debt instrument for massive sovereign debt that nobody disputes with sovereign debt from the get-go. Only now through assertion of the corporate form, do the defendants claim that it's no longer sovereign debt, even though in every other instance other than here, the leaders of Moldova are happy to say that it's their debt and to go negotiate on behalf of MoldovaGaz for further contracts involving that debt. And then you also have an instance where you have a former Soviet country that is trying to provide natural gas to its citizens. And it just strains credulity to say that it's just any run-of-the-mill energy company would provide an entire region with free natural gas. I think ultimately what that shows you is that Transnistria is a separatist region that there's a dispute as to whether Moldova or and it's obviously in Moldova's interest to continue providing natural gas through its state natural gas company in order to say that that's still part of Moldova. So again, but Moldova can provide natural gas to a region within its country through an entity that might be its organ or instrumentality that is not itself an alter ego. It might be heavily regulated and it might be an organ. So we're not questioning that that's what's happening. The question is whether it between MoldovaGaz and the Republic of Moldova. Sure. Fair enough, your honor. And I would say that when you look at everything else that's going on here, that's exactly what's happening. I think the facts here are strikingly similar to Crystal X. They're strikingly similar to Breedus. In fact, MoldovaGaz points out that in the other treaties that it claims are just run-of-the-mill treaties, like agreements like the Moldova-Russia agreement, one of them is the in Breedus, the fifth circuit held that Turkmenistan was the alter ego of its state gas company because that's what's happening in these cases is that a country is using its state gas company to do its bidding and to do the things that are important to that country. And for them to then come into court in the United States and evade a 23-year-old debt on the claim that, oh, well, you know, look, you really can't pierce the corporate form. You can't treat this as an organ. This is all just an arm's length company. Maybe I missed it, but why did Lloyd's come to New York to enforce the arbitral award they got elsewhere? What was the original impetus for that? To be frank with your honor, I'm not sure. Obviously, I wasn't involved at that point. It was many years ago. And obviously, there's not a large record on that because, of course, the defendants didn't show up. And so things went pretty quickly. But what we would say is that, you know, just to spend a minute or two on the other issues with respect to venue, completely agree with the questions that your honors asked of Mr. Baldwin, that venue plainly applies in the renewal judgment action because the default judgment that's being renewed occurred in the same court. In fact, it was the same judge. And then the other thing I would point out- There's some practice commentary in Weinstein Court in Miller that suggests that the original judgment in a 50-40-14 action is not arrest, nor does it constitute the transaction of business in the state for purposes of venue. So I'm wondering whether you can maintain that the default action is the event that allows the renewal action. So I think you can, your honor. That commentary might go to our alternative argument about property. But I think that with respect to whether the substantial events occurred, as your honor pointed out, you know, one of the substantial events was that defendants didn't show up. And so therefore, the default judgment was entered. And I think that it would be somewhat odd to suggest that a judgment that's entered in one court can't be renewed because there's not venue in the same court. And so if there's, you know, to the extent that the Republic wants to argue that venue wasn't proper in the first instance, clearly they forfeited that because they didn't bring that argument in sufficient time under Rule 60. Well, I understood Moldova's initial brief to say at page 34, venue in the original proceeding is no longer subject to challenge. Correct. That's right, your honor. And I think they had to acknowledge that because of the way that Rule 60 works in terms of time limits. The other thing I would say... Don't you, are you arguing that the renewal is still an action to enforce the arbitral award? Isn't that how you get past the Bar and Siamese Act in the first place? And doesn't that require seeing the renewal as part of the original proceeding? But now on venue, you're emphasizing the distinction between the two proceedings. Isn't there a tension there? So, no, I don't think that there is a tension there, your honor. You know, the first thing I would point out is that defendants didn't raise that argument below and therefore they forfeited it. It goes to sovereign immunity. So it's clearly a waivable issue. The second thing I would point out is that what our argument is that it's not a pure confirmation action the same way that the original one was, but it's an extension of that. And, you know, if you look at a number of FSIA cases in the context of judgment enforcement, that's often the way that the court does the analysis in terms of whether an FSIA exception applies in the new action. And it looks to the things that happened that led to that judgment that's being enforced. And then the final thing I would say is that the arbitration exception is not the only avenue that we argue there's jurisdiction here. We also argued implicit waiver. The district court didn't address that with respect to Moldova. It did with respect to Moldova gas through the direct benefits estoppel doctrine. And I would point out that the Republic of Moldova has literally not challenged the direct benefits estoppel conclusion at all on appeal. And so here you've got direct benefits estoppel, which binds them to the arbitration award. And then through this court's decision in seat transport, that means that they've implicitly waived sovereign immunity in a court where that arbitral word can be enforced. I mean, direct benefits estoppel is a doctrine for when somebody who's admittedly a non-party to the original agreement should be bound to it. Why should that kind of an equitable doctrine control our interpretation of the language in the FSIA that says an agreement made by the sovereign? Does it make sense that we're using this kind of equitable doctrine to interpret Congress's language in a statute about who makes an agreement? It does, your honor, because the concept of making an agreement means are you binding yourself to that agreement? The FSIA does not say someone who signed an agreement to arbitrate. And so the equitable doctrines work in order to say who's bound by the agreement such that the arbitration exception or the implicit waiver exception under seat transport can apply. And here, the Republic doesn't contest the fact that they were subject to direct benefits estoppel. And I think particularly in the context of a state-run natural gas company where the contract is being negotiated by the government, it makes perfect sense to say that direct benefits estoppel applies. And the way that the direct benefits estoppel applies here is that Moldova had an obligation to Russia in order to make sure that the contract was implemented. It did so. The direct benefit, therefore, of the contract was that Moldova satisfied its obligation to Russia. And the other thing I'd point out is that's whether a non-signatory to Turkmenistan to an arbitration agreement could be bound such that the agreement could be enforced against that country. And it didn't happen through direct benefits estoppel there. It happened through alter ego. Of course, we argue both in this context. And this court's decision in Thompson plainly establishes that you can enforce against a non-signatory through any of the five various avenues that the court laid out there, two of which are alter ego and direct benefits estoppel. I'd also point out that because of this argument here that we're talking about, this analysis, that means that even if this court were to disagree on alter ego and Oregon, and certainly we don't encourage you to do so, we think that the record is quite clear on both, the court could still affirm with respect to Moldova. All right. Let's end it there. We've gone way over, but we'll hear now some rebuttal from the appellants. Mr. Cry, you've got three minutes. Thank you, your honor. Mr. McGinley accuses us of trying to reverse the decision below by quibbling with facts in isolation. The problem is that once you remove all the facts we quibble with, there's simply nothing left to support the district court's judgment because every fact she relied on falls into one of three buckets, either an ordinary exercise of shareholder authority by appointing people to the board or exercising voting power, regulatory decisions. So, Mr. Cry, on those fact findings, you have to show us clear error, don't you? No, your honor, because- No reasonable fact finder could have found the facts that the judge found. Your honor, I want to be clear on this because the parties actually agree on what the standards are. The underlying historical facts are definitely clear error. The question about whether facts add up to alter ego status, that is de novo. But you just said, and this is why I want to understand it, that when you remove the facts that the district court found, you're left with nothing that can support its legal conclusion. But unless you can show us clear error, don't we have to accept the judge's findings of fact? Now we have to decide whether they're to support the legal conclusion, but I don't think you've tried to argue to us that the individual fact findings are clear errors so that we would just sweep them off the table. Your honor, I apologize. I probably did not express my point very well. Okay, help me out. What I meant to say was the facts that the district court found are not relevant to alter ego status. So once you remove all the factual findings that are not relevant, there's nothing left. We are not disputing underlying fact findings as far as 99% of our case is concerned. And it's telling that the two things they point to as disputed facts, the first one, they claim we disputed- Before you get to the disputed facts, you were saying that the facts fall into three buckets. You said ordinary shareholder authority, regulatory decisions. And I don't think you got to the third one. I'm just curious what you were going to say. Right. The third one would be the handful of 20 year old high level financial transactions like that one supply agreement that just don't relate to the company's day-to-day affairs. Turning then to what they claim are the disputed facts. The first one they point to is the chairman's broad authority to manage the company, but there's no dispute over that fact at all. We absolutely agree that the chairman of Moldova Gas has broad management authority. The problem is under EM limited, the government is allowed to appoint somebody who exercises broad authority over the company in its capacity as shareholder. As Judge Menasche points out, it's certainly also a helpful fact for us that those appointees have to be approved by the supervisory council that's dominated by Gasprom, but even absent that approval, even if the government unilaterally appointed the board members of the company under EM limited, that's clearly not enough to establish alter ego status. So that's the case where we say that if the country is exercising control through officers it appoints, it's not an alter ego, right? Is that the basic principle? The basic principle in EM limited is that appointments of board members is not enough. The plaintiff has to show that the sovereign is using those appointments to interfere in the day-to-day operations of the company, and that's what's missing. Can I ask you about the buckets argument? I mean, isn't every alter ego case, isn't it going to be that if you looked at pieces of evidence in isolation, it's going to look like corporate formalities are being observed, but part of the analysis is to look at everything together and whether the country or the parent company is effectively dominating the corporation, right? Isn't the whole point that there are corporate formalities being observed in some sense? So why isn't it right that we shouldn't analyze it this way by looking at the different pieces in isolation? You can analyze it in the aggregate, but the point is the things you're adding up have to be individually relevant in some fashion. So the fact that the government appoints board members simply isn't relevant if you look at it in isolation, and it's not relevant if you look at it in combination with other facts, that's just an ordinary exercise of shareholder. What about the allegation or the suggestion of undercapitalization? And so I think the key is, was it undercapitalized at the outset, or did it become undercapitalized going forward? But I'd like you to address that. So the district court's only basis for finding that there was undercapitalization at the outset was two things. First, it claimed that there was no independent valuation of the capital contributions, and second, it claimed that there was a one-year delay in contributing about a third of the capital. The problem is, neither of those has any support in the record, and the other side concedes that. They didn't argue anything in their brief to identify any support for either of those actual findings. The whole purpose of creating Moldova Gas was to deal with that substantial debt that existed before it was created, right? It had a substantial debt, but it also had substantial assets. And actually, if you look at page 963 of the appendix, it reproduces the capital table that documents the capital that was contributed to the company upon formation, which includes the debts on the one hand, sure, but it also includes substantial assets, major enterprises in Moldova that had substantial value. And the net difference, assets versus debt, was 290 million US dollars, and there was no evidence to the contrary. That initial capital was independently valued at the time the company was formed. In fact, as the record makes clear, Moldova Gas could not have registered its shares with the National Commission on Financial Markets. It sounds like you acknowledge that this is a fact that's relevant to the alter ego status, you just seem to dispute it. The undercapitalization? Yeah, sure, sure. At the time of formation, absolutely. The problem is here that the two facts the district court pointed to are just undefended by Gator on appeal, and they shifted in their appeal brief to claiming that the problem is that now the company owes six and a half billion dollars to Gazprom, but that's not relevant. Post-formation operating losses do not show an abuse of the corporate form, especially on the record in this case, which makes clear that those losses have nothing to do with shareholders trying to defraud creditors, but instead have to do with the fact that transnistrians don't pay their gas bills. There was a suggestion that the government had improperly influenced the company by trying to run one of the board chairmen out of the country for disagreeing with the party line. First of all, I want to make clear what the basis for that finding was, because at the time Mr. Gusev left the company in 2005, that was three years after the complaints about rates that Gators were lying on, and prosecutors investigating the case at the time said that they had discovered evidence of currency and accounting frauds at the company. The only evidence suggesting that that was a pretext was a newspaper article that quoted an anonymous source who speculated that the government was trying to get the chairman sacked. So I guess this is the one other example where we're disputing a fact, but I'm perfectly comfortable doing that, because a single newspaper article quoting an anonymous source claiming that a foreign government's justification for a criminal investigation is a pretext, that's an extraordinary finding, and it really needs to be based on something a little more than that. But even if you think it was a pretext, I think this is the point you made earlier, Judge Menashe, which I think was right on. If the government actually dominated the company's day-to-day affairs, they would not need to concoct some sort of pretextual criminal investigation to run somebody out of the country. They would just remove him. The fact that they had to go to those lengths, as speculated by Gator in this case, to accomplish that proves that the company has a separate status, and it's not an exercise by a dominant shareholder, it's an exercise of the government's sovereign authority to investigate suspected crimes. Mr. Cryer, let me ask you, if we agree with you, what are you saying the remedy should be on this judge? Right, so if you agree with us that there is no alter ego relationship between the Republic and Moldova gas, then as far as we're concerned, that's the end of the case. There is an argument on the other side. What should Gator be doing, or what should they have done? They have this judge, right, that they own, and you're just saying it's not recoverable at all any place on the planet. Well, so their original judgment is more than 20 years old now, so as far as practicalities are concerned, there's nothing left of that. That, you know, in any country in the world, as far as I'm aware, these would be time-barred debts at this point. What they're trying to do is get around the statute of limitations by taking advantage of this New York statute that allows them to get a renewal judgment based on a debt that's now 25 years old In order to do that, they have to show there's a basis for hauling Moldova gas into New York court, even though, by all accounts, Moldova gas has zero connection with this forum, apart from the original action and this action. The original award was given in Russia, right? That's where the arbitration happened? The award was delivered in Russia, correct. Right, so maybe there's a remedy in Russian courts. Do we know that there isn't? I mean, I don't, you're saying it's not enforceable anywhere. The only possible place of enforcement is in our courts, but is that necessarily true? I mean, you'd have to look at the statute of limitations for each jurisdiction. My general sense of things is that the 20-year statute for enforcing prior judgments in New York is pretty long by global standards. Now, you said that, as far as you're concerned, if it's not an alter ego, that's the end of the issue. If it's not an alter ego, but is an organ or instrumentality of the republic, then we should treat it like a foreign sovereign. So the FSIA treats foreign sovereigns and its agencies' instrumentalities the same way, so why shouldn't we treat them the same way for personal jurisdiction purposes? Right, the court does need to address that issue. As we read Pemex and Frontera, those cases say that the test for whether you have personal jurisdiction rights is the BANCEC standard. So having held that twice now in two different decisions, I don't see how they can still be arguing that we are not an alter ego for purposes of BANCEC, but that nonetheless, we still lack due process rights. No, the case has said that it is, that there is personal jurisdiction because it is the sovereign if there's alter ego status, but haven't we reserved judgment on the question as to whether if it's an organ or instrumentality that maybe it still should be treated the same way as a we haven't said that one way or the other. Join the meeting. Frontera certainly reserved that question. I think Pemex was a little more clear in our favor, but even if you think that question is still open in this court, I would direct the court's attention to the DC Circuit's decision in the GSS case, the Fifth Circuit's decision in the First Investment case. Both those have very lengthy discussions of this topic and adopt the position that we advocate. And in particular, I'd note that Frontera, when it reserved this in the DC Circuit's TMR decision, that it felt created some ambiguity over this issue. But then a couple years later, GSS came along, discussed that specific footnote at length and definitively resolved this precise issue in the DC Circuit. So the footnote from another case that led TMR to have, or sorry, that led Frontera to have some doubts about this has now been conclusively resolved against Gator in the circuit that originally decided that case. And we think that decision is persuasive and should be followed here. This is clearly the majority rule followed throughout the country, except for this one Seventh Circuit decision that didn't really analyze the issue at all. We're at nine minutes over, I think, Mr. Kreis, so all good things have to come to an end. And I want to hear from Mr. Baldwin for a minute, which last time turned me into... Thank you, Your Honor. Thank you. Thank you, Your Honor. I'll be very brief. Counsel for Gator stated that the substantial event in this case is that the defendants didn't show up. But we would argue that can't be the substantial event because that predated the judgment. And therefore, if you have an action that predates the judgment, then you're seeking to renew that judgment. The court said that the default judgment is the action, not anything that occurred before the default judgment, that it seems like they're seeking to relitigate the argument. Counsel for Gator also said that you have not challenged the application of direct benefits estoppel. Is that accurate? Well, if you look at the court's decision on page SPA 118, the court ties essentially or makes arguments that the alter ego finding is related to the direct benefits finding. So we've challenged the court's legal conclusions with regard to alter ego. We think that serves as a challenge to the direct benefits issue. All right. All right. Well, thank you all. Interesting argument, and certainly we got our money's worth. So we will reserve decision.